## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-cv-00211 |
| | ) | |
| WISCONSIN PUBLIC SERVICE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REMEDIAL ACTION CONSENT DECREE FOR THE WISCONSIN PUBLIC SERVICE CORPORATION MANITOWOC MANUFACTURED GAS PLANT SUPERFUND ALTERNATIVE SITE

# TABLE OF CONTENTS

I.      BACKGROUND ..................................................................................................................... 1
II.     JURISDICTION ..................................................................................................................... 2
III.    PARTIES BOUND ................................................................................................................. 2
IV.     DEFINITIONS ........................................................................................................................ 3
V.      GENERAL PROVISIONS ..................................................................................................... 7
VI.     PERFORMANCE OF THE WORK ...................................................................................... 8
VII.    REMEDY REVIEW ............................................................................................................ 11
VIII.   PROPERTY REQUIREMENTS ......................................................................................... 11
IX.     FINANCIAL ASSURANCE ................................................................................................ 17
X.      PAYMENTS FOR RESPONSE COSTS ............................................................................ 21
XI.     INDEMNIFICATION AND INSURANCE ......................................................................... 23
XII.    FORCE MAJEURE .............................................................................................................. 25
XIII.   DISPUTE RESOLUTION ................................................................................................... 26
XIV.    STIPULATED PENALTIES ............................................................................................... 28
XV.     COVENANTS BY PLAINTIFF .......................................................................................... 31
XVI.    COVENANTS BY SD .......................................................................................................... 33
XVII.   EFFECT OF SETTLEMENT; CONTRIBUTION .............................................................. 35
XVIII.  ACCESS TO INFORMATION ........................................................................................... 36
XIX.    RETENTION OF RECORDS .............................................................................................. 37
XX.     NOTICES AND SUBMISSIONS ........................................................................................ 37
XXI.    RETENTION OF JURISDICTION ..................................................................................... 39
XXII.   APPENDICES ...................................................................................................................... 39
XXIII.  MODIFICATION ................................................................................................................. 40
XXIV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ....................................... 40
XXV.    SIGNATORIES/SERVICE ................................................................................................. 40
XXVI.   FINAL JUDGMENT ........................................................................................................... 41

# I.    BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency (EPA) filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9606 and 9607.

B.    The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice (DOJ), and the State for response actions at the WPSC Manitowoc MGP Superfund Alternative Site in Manitowoc, Wisconsin ("Site"), together with accrued interest; and (2) performance of response actions by the defendant at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 (NCP).

C.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of Wisconsin (the "State") on November 14, 2019, of negotiations with the potentially responsible party (PRP) regarding the implementation of the remedial action (RA) for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree (CD).

D.    In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the National Oceanic and Atmospheric Administration ("NOAA") on November 14, 2019, of negotiations with the PRP regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this CD.

E.    The defendant, Wisconsin Public Service Corporation, that has entered into this CD ("Settling Defendant" or "SD") does not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor does it acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

F.    In response to a release or a substantial threat of a release of a hazardous substance(s) at or from the Site, SD commenced a Remedial Investigation and Feasibility Study (RI/FS) for the Site pursuant to 40 C.F.R. § 300.430.

G.    SD completed a Remedial Investigation (RI) Report on January 22, 2014, and SD completed a Feasibility Study (FS) Report on March 29, 2018.

H.    Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action in July 2018, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the administrative record upon which the Superfund Division Director, EPA Region 5, based the selection of the response action, is available for review.

I.    The decision by EPA on the remedial action to be implemented at the Site is embodied in a Record of Decision (ROD), executed on September 21, 2018, on which the State

has given its concurrence. The ROD addresses Operable Unit 1 (OU 1 ROD) at the Site for soil and groundwater source control. A ROD for Operable Unit 2 (river sediment) and Operable Unit 3 (groundwater) will be issued at a future date. The ROD includes EPA's explanation for any significant differences between the final plan and the proposed plan as well as a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

J.      On March 28, 2019, EPA and SD entered into an Administrative Order on Consent for Remedial Design for SD to design the selected remedy for the Site and pay EPA oversight costs.

K.      Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by SD if conducted in accordance with this CD and its appendices.

L.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SD shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

M.      The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.      JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SD. Solely for the purposes of this CD and the underlying complaint, SD waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. SD shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.      PARTIES BOUND

2.      This CD is binding upon the United States and upon SD and its successors, and assigns. Any change in ownership or corporate or other legal status of the SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter SD's responsibilities under this CD.

3.      SD shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SD or its contractors shall provide written notice of the CD to all subcontractors hired to

perform any portion of the Work. SD shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SD within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV. DEFINITIONS

4.     Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to implement the Remedial Action, including, but not limited to, properties owned by the Settling Defendant, the City of Manitowoc, Tom Kitzerow Enterprises LLC, and the 306 North Tenth Street Building LLC. These areas are depicted in Appendix C.

"AOC" shall mean the Administrative Order on Consent for Remedial Design between EPA and WPSC captioned In the Matter of WPSC Manitowoc MGP Site, Docket No. V-W-19-C-005.  The AOC is attached hereto as Appendix A.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this CD shall control.

"Continuing Obligations" shall mean land use restrictions that shall be imposed on Affected Property pursuant to Wis. Admin. Code § NR 726.15.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"Date of Notice of RD Completion" shall mean the date upon which EPA issues a notice of completion of the Remedial Design to Settling Defendant.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Oversight Costs" shall mean that portion of Future Response Costs that EPA incurs in monitoring and supervising SD's performance of the Work to determine whether such performance is consistent with the requirements of this CD, including costs incurred in reviewing deliverables submitted pursuant to this CD, as well as costs incurred in overseeing implementation of the Work; however, Future Oversight Costs do not include, *inter alia*: the costs incurred by the United States pursuant to ¶ 11 (Emergencies and Releases), Section VII (Remedy Review), Section VIII (Property Requirements), and ¶ 27 (Access to Financial Assurance), or the costs incurred by the United States in enforcing this CD, including all costs incurred pursuant to Section XIII (Dispute Resolution), and all litigation costs.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise *implementing*, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 27 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. Future Response Costs shall also include all Interim Response Costs, and all Interest on those Past Response Costs SD has agreed to pay under this CD that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from March 20, 2020 to the Effective Date.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site. The WDNR imposes Continuing Obligations to meet the Institutional Controls requirements.

"Institutional Control Implementation and Assurance Plan" or "ICIAP" shall mean the plan for implementing, maintaining, monitoring, and reporting on the Institutional Controls set forth in the ROD, prepared in accordance with the AOC Statement of Work ("SOW").

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between March 20, 2020 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than the Settling Defendant, that owns or controls any Affected Property, including the City of Manitowoc, Tom Kitzerow Enterprises LLC, and 306 North Tenth Street Building LLC. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States and SD.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through March 20, 2020, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD.

"Plaintiff" shall mean the United States.

"Proprietary Controls" shall mean Continuing Obligations that run with the land that (a) limit land, water, or other resource use and (b) are created in accordance with Section 292.12 of the Wisconsin Statutes as such statute exists as of the Effective Date or the Date of Notice of RD Completion, whichever is later.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to Operable Unit 1 at the Site signed on September 21, 2018, by the Director, Superfund Division, EPA Region 5 and all attachments thereto. The ROD is attached as Appendix B.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Action Work Plan" or "RAWP" shall mean the document developed pursuant to the CD and approved by EPA, and any modifications thereto.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SD to develop final plans and specifications for the RA pursuant to the AOC and the Remedial Design Work Plan.

"Remedial Design Work Plan" shall mean the document developed pursuant to the AOC and approved by EPA, and any modifications thereto.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendant" or "SD" shall mean Wisconsin Public Service Corporation.

"Site" shall mean the WPSC Manitowoc MGP Superfund Alternative Site, encompassing approximately 2 acres, located in Manitowoc, Wisconsin, and depicted generally on the map attached as Appendix C.

"State" shall mean the State of Wisconsin.

"Statement of Work" or "SOW" shall mean the document describing the activities SD must perform to implement the RA, and O&M regarding the Site, which is attached as Appendix D.

"Supervising Contractor" shall mean the principal contractor retained by SD to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, and any federal natural resource trustee.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27); and (4) any "hazardous substance" under Wis. Stat. § 292.01.

"WDNR" shall mean the Wisconsin Department of Natural Resources and any successor departments or agencies of the State.

"WDNR Database" shall mean the publically accessible database available on the internet as required by WIS. STAT. §§ 292.12, 292.31, and 292.57. The WDNR Database is accessible at http://dnr.wi.gov/org/aw/rr/brrts/index.htm

"Work" shall mean all activities and obligations SD is required to perform under this CD, except the activities required under Section XIX (Retention of Records).

"WPSC Manitowoc Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).


# V. GENERAL PROVISIONS

5.  **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SD, to pay response costs of Plaintiff, and to resolve the claims of Plaintiff against SD.

6.  **Commitments by SD**

    a.  SD shall finance and perform the Work in accordance with the AOC, this CD, the ROD, the SOW, and all work plans and other plans, standards, specifications, and schedules set forth in this CD, the AOC, or developed by Settling Defendant and approved by EPA pursuant to this CD or the AOC. Upon entry of this CD and as of the Date of the Notice of RD Completion, the work plan and all other plans, standards, specifications, and schedules set forth in or developed and approved by EPA pursuant to the AOC shall be incorporated into and become enforceable under this CD. SD shall pay the United States for Past Response Costs and Future Response Costs as provided in this CD.

    b.  SD shall comply with the AOC and shall perform all work required under the AOC in accordance with the terms of the AOC, until such time as the AOC is superseded by this CD pursuant to this Paragraph. If EPA determines that SD is in full compliance with the terms and obligations of the AOC as of the Date of the Notice of RD Completion, this CD shall supersede the AOC as of the Date of the Notice of RD Completion with respect to all subsequent obligations. If EPA determines that SD is not in full compliance with the terms and obligations of the AOC as of the Date of the Notice of RD Completion, EPA shall notify SD of what is needed to come into compliance, and both the AOC and this CD shall be in full force and effect until EPA subsequently determines that SD has achieved full current compliance with the terms and conditions of the AOC, at which time this CD shall supersede the AOC. If this CD is not entered by the Court, the AOC shall not be superseded and this CD shall have no effect on the AOC. Any documents that are required to be submitted under this CD that have been submitted by SD pursuant to the AOC need not be resubmitted after the date that this CD supersedes the AOC, unless EPA determines that such submittal is inadequate. Nothing in this CD shall be deemed to bar the United States from enforcing the AOC for SD's failure to comply with the AOC as of the

date of entry of this CD.  With respect to violations of the AOC occurring prior to the date that the AOC is superseded by this CD, EPA, at any time (including after the date that the AOC has been superseded by this CD), may seek penalties or punitive damages pursuant to Sections 106(b) and 107(c)(3) of CERCLA, 42 U.S.C. §§ 9606(b) and 9607(c)(3), notwithstanding any correction of such violations.

7.  **Compliance with Applicable Law**. Nothing in this CD limits SD's obligations to comply with the requirements of all applicable federal and state laws and regulations. SD must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.  **Permits**

a.  As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SD shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.  SD may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.  This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.  PERFORMANCE OF THE WORK

9.  **Coordination and Supervision**

a.  **Project Coordinators**

(1)  SD's Project Coordinator must have sufficient technical expertise to coordinate the Work. SD's Project Coordinator may not be an attorney representing SD in this matter and may not act as the Supervising Contractor. SD's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)  EPA shall designate and notify the SD of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator

will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3) The State shall designate and notify EPA and the SD of its Project Coordinator and Alternate Project Coordinator. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which EPA's Project Coordinator participates, the State's Project Coordinator also may participate. SD shall notify the State reasonably in advance of any such meetings or inspections.

(4) SD's Project Coordinators shall meet with EPA's and the State's Project Coordinators at least monthly.

b. **Supervising Contractor**. SD's proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c. **Procedures for Disapproval/Notice to Proceed**

(1) SD shall designate, and notify EPA, within 10 days after the Date of Notice of RD Completion, of the name, title, contact information, and qualifications of the SD's proposed Project Coordinator and Supervising Contractor, whose qualifications shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

(2) EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SD shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SD may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SD's selection.

(3) SD may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

(4)      Notwithstanding the procedures of ¶¶ 9.c(1) through 9.c(3), SD has proposed, and EPA has authorized SD to proceed, regarding the following Project Coordinator.

Robert Paulson
WEC Business Services
333 West Everett St.  A231
Milwaukee, WI 53202
Robert.paulson@wecenergygroup.com
(414) 221-3948

10.      **Performance of Work in Accordance with SOW**. SD shall: (a) perform the RA; and (b) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 5.6 (Approval of Deliverables) of the SOW.

11.      **Emergencies and Releases**. SD shall comply with the emergency and release response and reporting requirements under ¶ 3.3 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants by Plaintiff), nothing in this CD, including ¶ 3.3 of the SOW, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SD's failure to take appropriate response action under ¶ 3.3 of the SOW, EPA takes such action instead, SD shall reimburse EPA under Section X (Payments for Response Costs) for all costs of the response action.

12.      **Community Involvement**. If requested by EPA, SD shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan. Costs incurred by the United States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13.      **Modification of SOW or Related Deliverables**

a.      If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SD of such modification. If SD objects to the modification it may, within 30 days after EPA's notification, seek dispute resolution under Section XIII.

b.      The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SD invokes dispute resolution, in

accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SD shall implement all work required by such modification. SD shall incorporate the modification into the deliverable required under the SOW, as appropriate.

        c.     Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14.     Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII. REMEDY REVIEW

15.     **Periodic Review**. SD shall conduct, in accordance with ¶ 3.6 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

## VIII. PROPERTY REQUIREMENTS

16.     **Agreements Regarding Access and Non-Interference.** SD shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SD and by Plaintiff, providing that such Non-Settling Owner: (i) provide Plaintiff and the SD, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 16.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action, including the restrictions listed in ¶ 16.b (Land, Water, or Other Resource Use Restrictions). In lieu of negotiating an agreement with any Non-Settling Owner of Affected Property that meets the requirements of (ii) immediately above, SD may provide notification to such Owner in accordance with Wis. Admin. Code § NR 725.07 and ¶16.c. below:

        a.     **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

        (1)     Monitoring the Work;

        (2)     Verifying any data or information submitted to the United States or the State;

        (3)     Conducting investigations regarding contamination at or near the Site;

        (4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 62 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SD or its agents, consistent with Section XVIII (Access to Information);

(9)     Assessing SD's compliance with the CD;

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

b.      **Land, Water, or Other Resource Use Restrictions**. The following is a list of land, water, or other resource use restrictions applicable to the Affected Property:

(1)     Soil-Any subsurface activity must be conducted in accordance with a Soil Management Plan to ensure proper management of subsurface soil disturbed through future site development, utility repairs, and other intrusive activities;

(2)     Groundwater-Construction of potable water wells and consumption of groundwater will be prohibited; and

(3)      Soil Gas/Vapor Intrusion- Vapor intrusion risks must be reassessed should any of the following conditions be satisfied:

    i.      Modification of land use;

    ii.     Construction of a new buildings

    iii.    Modification to existing buildings that may negatively affect the vapor intrusion pathway.

c.      Proprietary Controls. Wisconsin DNR will impose Continuing Obligations on all properties with residual contamination including any Non-Settling Owner's Affected Property. Continuing Obligations will be imposed in the ICIAP approval letter for the site and will require notification to affected parties in accordance with Wis. Admin. Code § NR 725.07

prior to imposition. SD will submit site information to the WDNR for posting on the WDNR Database in accordance with Wis. Admin. Code § NR 726.15. The Continuing Obligations will impose restrictions on the land, water, or other resource uses set forth in ¶ 16.b (Land, Water, or Other Resource Use Restrictions).

    d. **Enforceability.** Per Wis. Stats. 292.12, the State is expressly authorized to impose and enforce the Continuing Obligations without acquiring an interest in real property.

    e. **Initial Title Evidence**. SD shall, within 45 days after the Date of Notice of RD Completion:

      (1) **Record Title Evidence**. Submit to EPA a title insurance commitment or other title evidence acceptable to EPA that: (i) names the proposed insured or the party in whose favor the title evidence runs, or the party who will hold the real estate interest, or if that party is uncertain, names the United States, the State, the SD, or "To Be Determined;" (ii) covers the Affected Property that is to be subject to Continuing Obligations (iii) identifies all record matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances (collectively, "Prior Encumbrances"); and (iv) includes complete, legible copies of such Prior Encumbrances; and

      (2) **Non-Record Title Evidence**. Submit to EPA a report of the results of an investigation, including a physical inspection of the Affected Property, which identifies non-record matters that could affect the title, such as unrecorded leases or encroachments.

    f. **Release or Subordination of Prior Liens, Claims, and Encumbrances**

      (1) SD shall secure the release, subordination, modification, or relocation of all Prior Encumbrances on the title to the Affected Property revealed by the title evidence or otherwise known to SD, unless EPA waives this requirement as provided under ¶¶ 16.f(2)-(4).

      (2) SD may, by the deadline under ¶ 16.e (Initial Title Evidence), submit an initial request for waiver of the requirements of ¶ 16.f(1) regarding one or more Prior Encumbrances, on the grounds that such Prior Encumbrances cannot defeat or adversely affect the rights to be granted by the Continuing Obligations and cannot interfere with the remedy or result in unacceptable exposure to Waste Material.

      (3) SD may, within 90 days after the Date of Notice of RD Completion, or if an initial waiver request has been filed, within 45 days after EPA's determination on the initial waiver request, submit a final request for a waiver of the requirements of ¶ 16.f(1) regarding any particular Prior

Encumbrance on the grounds that SD could not obtain the release, subordination, modification, or relocation of such Prior Encumbrance despite best efforts.

(4)     The initial and final waiver requests must include supporting evidence including descriptions of and copies of the Prior Encumbrances and maps showing areas affected by the Prior Encumbrances. The final waiver request also must include evidence of efforts made to secure release, subordination, modification, or relocation of the Prior Encumbrances.

(5)     SD shall complete its obligations under ¶ 16.f(1) regarding all Prior Encumbrances: within 180 days after the Date of RD Completion; or if an initial waiver request has been filed, within 135 days after EPA's determination on the initial waiver request; or if a final waiver request has been filed, within 90 days after EPA's determination on the final waiver request.

g.     **Update to Title Evidence and Recording of Proprietary Controls**

(1)     SD shall submit to EPA for review and approval, by the deadline specified in ¶16(f)(5), all draft instruments updating Prior Encumbrances, as necessary.

(2)     Within 20 days of EPA's approval of any draft instruments, SD shall update the original title insurance commitment (or other evidence of title acceptable to EPA) under ¶16(e) (Initial Title Evidence). If the updated title examination indicates that no liens, claims, rights, or encumbrances have been recorded since the effective date of the original commitment (or other title evidence), SD shall secure the immediate recordation of instruments addressing Prior Encumbrances in the appropriate land records. Otherwise, SD shall secure the release, subordination, modification, or relocation under ¶16.f(1) , or the waiver under ¶¶ 16.f(2)-(4), regarding any newly-discovered liens, claims, rights, and encumbrances, prior to recording the instruments addressing Prior Encumbrances.  If SD submitted a title insurance commitment under ¶ 16.e(1) (Initial Title Evidence), then upon the recording of the instruments addressing Prior Encumbrances, SD shall obtain a title insurance policy that: (i) is consistent with the original title insurance commitment; (ii) is for $100,000 or other amount approved by EPA; (iii) is issued to the United States, SD, or other person approved by EPA; and (iv) is issued on a current American Land Title Association (ALTA) form or other form approved by EPA.

(3)     SD shall, within 30 days after the recording of the instruments addressing Prior Encumbrances, or such other deadline approved by EPA, provide to the United States and to all grantees of the instruments addressing Prior Encumbrances: (i) certified copies of the recorded instruments addressing Prior Encumbrances showing the clerk's recording stamps; and (ii) the title insurance policy(ies) or other approved form of updated title evidence dated as of the date of recording.

h.      **Recording of Proprietary Controls**

(1)      Proprietary Controls will be imposed as Continuing Obligations. The Institutional Control Implementation and Assurance Plan (ICIAP) approval letter issued by WDNR will impose Continuing Obligations on the properties where restrictions to limit land, water or resource use are required and/or to require maintenance of a performance standard such as engineered barriers. Imposition of the Continuing Obligations includes posting of the approval letter in the WDNR Database.

(2)      At least 30 days prior to submitting the final ICIAP to EPA and DNR as part of the Remedial Action Work Plan, the SD will provide notice to the Non-Settling Owners of Affected Property in accordance with Wis. Admin. Code §NR 725.05 of the intent to impose Continuing Obligations on their property. Confirmation of notification provided to the Non-Settling Owners of Affected Property must be included with the submitted ICIAP.

(3)      Upon EPA and State approval of the proposed ICIAP, the State will impose Continuing Obligations through approval of the ICIAP and will post the approval letter documenting the Continuing Obligations in the WDNR Database in accordance with Wis. Admin. Code § NR 726.15.

(4)      The State will mail written notice of the approval of the ICIAP, including imposition of the Continuing Obligations, to the SD and the Non-Settling Owners of Affected Property, confirming that the Continuing Obligations are in place.

(5)      As part of certifying the Completion of Work under Section 3.7 of the SOW, EPA and WDNR may update or impose new restrictions, limitations, or other conditions on the property, and WDNR shall impose the required Institutional Controls in the form of Continuing Obligations. The SD will provide notification to the affected Non-Settling Owners of Affected Property in accordance with Wis. Admin. Code § NR 725.05 and the WDNR will update the Continuing Obligations in the WDNR Database in accordance with Wis. Admin. Code § NR 726.15.

(6)      Should EPA and WDNR determine that the Continuing Obligations require modification, or SD takes an action that requires modification to Continuing Obligations, SD shall follow Wis. Admin. Code § NR 727.07 to notify the agencies of the modification and Wis. Admin Code § NR 727.09 to provide the information necessary for the State to impose the modified Continuing Obligations and update the WDNR Database.

(7)      SD shall monitor and annually report on all Continuing Obligations required under this CD.

17.  **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. If SD is unable to accomplish what is required through "best efforts" in a timely manner, it shall notify the United States, and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist SD, or take independent action, in obtaining such access and/or use restrictions, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

18.  If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed (other than the WDNR postings on the WDNR Database described herein), SD shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such Institutional Controls.

19.  **Notice to Successors-in-Title**

a.  If SD has acquired any of the Affected Property, then SD shall, within 15 days after the Effective Date, submit for EPA approval, after consultation with WDNR, a notice to be filed regarding SD's Affected Property in the appropriate land records. The notice must: (1) include a proper legal description of the Affected Property; (2) provide notice to all successors-in-title: (i) that the Affected Property is part of, or related to, the Site; (ii) that EPA has selected a remedy for the Site; and (iii) that potentially responsible parties have entered into a CD requiring implementation of such remedy; and (3) identify the U.S. District Court in which the CD was filed, the name and civil action number of this case, and the date the CD was entered by the Court. The notice shall also state that information relating to Institutional Controls impacting the property is maintained on the WDNR Database and include the internet address for the WDNR Database. SD shall record the notice within 10 days after EPA's approval of the notice and submit to EPA, within 10 days thereafter, a certified copy of the recorded notice.

b.  SD shall, prior to entering into a contract to Transfer SD's Affected Property, or 60 days prior to Transferring Owner SD's Affected Property, whichever is earlier:

(1)  Notify the proposed transferee that EPA has selected a remedy regarding the Site, that potentially responsible parties have entered into a CD requiring implementation of such remedy, and that the United States District Court has entered the CD (identifying the name and civil action number of this case and the date the CD was entered by the Court); and

(2)     Notify EPA and the State of the name and address of the proposed transferee and provide EPA and the State with a copy of the notice that it provided to the proposed transferee.

20.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SD shall continue to comply with its obligations under the CD, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property, and to implement, maintain, monitor, and report on Institutional Controls.

21.     Notwithstanding any provision of the CD, Plaintiff retain all of its access authorities and rights, as well as all of its rights to require land, water, or other resource use restrictions and Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## IX.     FINANCIAL ASSURANCE

22.     In order to ensure completion of the Work, SD shall secure financial assurance, initially in the amount of $7,200,000 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SD may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.  At least 10% of the financial assurance needs to be in the form listed in 22 a, b, c or d.

a.      A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.      A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.      A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.      A demonstration by SD that it meets the relevant test criteria of ¶ 24, accompanied by a standby funding commitment, which obligates the affected SD to pay

funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.      A guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of SD or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with SD; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of ¶ 24.

23.      SD shall, within 30 days of the Date of Notice of RD Completion, obtain EPA's approval of the form of SD's financial assurance. Within 30 days of such approval, SD shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the EPA Regional Financial Management Officer, to the United States, and to EPA and the State as specified in Section XX (Notices and Submissions).

24.      SD seeking to provide financial assurance by means of a demonstration or guarantee under ¶ 22.e or 22.f, must, within 30 days of the Date of Notice of RD Completion:

a.      Demonstrate that:

(1)      the SD or guarantor has:

i.      Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii.      Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii.      Tangible net worth of at least $10 million; and

iv.      Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

(2)      The SD or guarantor has:

i.      A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

ii. Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii. Tangible net worth of at least $10 million; and

iv. Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b. Submit to EPA for the SD or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

25. SD providing financial assurance by means of a demonstration or guarantee under ¶ 22.e or 22.f must also:

a. Annually resubmit the documents described in ¶ 24.b within 90 days after the close of the affected SD's or guarantor's fiscal year;

b. Notify EPA within 30 days after the affected SD or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c. Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the SD or guarantor in addition to those specified in ¶ 24.b; EPA may make such a request at any time based on a belief that the SD or guarantor may no longer meet the financial test requirements of this Section.

26. SD shall diligently monitor the adequacy of the financial assurance. If SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, SD shall notify EPA of such information within 7 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the SD of such determination. SD shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the

requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SD shall follow the procedures of ¶ 28 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SD's inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Settlement.

27. **Access to Financial Assurance**

a. If EPA issues a notice of implementation of a Work Takeover under ¶ 62.b, then, in accordance with any applicable financial assurance mechanism, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 27.d.

b. If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 27.d.

c. If, upon issuance of a notice of implementation of a Work Takeover under ¶ 62.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism [and/or related standby funding commitment], whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee under ¶ 22.e or 22.f, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SD shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d. Any amounts required to be paid under this ¶ 27 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the WPSC Manitowoc MGP Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e. All EPA Work Takeover costs not paid under this ¶ 27 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

28. **Modification of Amount, Form, or Terms of Financial Assurance**. SD may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 23, and must include an

estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify SD of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. SD may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). SD may change the form or terms of the financial assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SD shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 23.

29.     **Release, Cancellation, or Discontinuation of Financial Assurance**. SD may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 3.7 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.     PAYMENTS FOR RESPONSE COSTS

30.     **Payment by SD for United States Response Costs**.

    a.     Within 60 days after the Effective Date, SD shall pay to EPA $6,341 in payment for Past Response Costs. Payment shall be made in accordance with ¶ 31.c (instructions for past response cost payments).

    b.     **Deposit of Past Response Costs Payment**. The total amount to be paid by SD pursuant to ¶ 30.a shall be deposited by EPA in the WPSC Manitowoc MGP Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

31.     **Payments by SD for Future Response Costs**. SD shall pay to EPA all Future Response Costs not inconsistent with the NCP.

    a.     **Periodic Bills**. On a periodic basis, EPA will send SD a bill requiring payment that includes an itemized cost summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. SD shall make all payments within 30 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 32, in accordance with ¶ d (instructions for future response cost payments).

b.    **Deposit of Future Response Costs Payments**. The total amount to be paid by SD pursuant to ¶ 31.a (Periodic Bills) shall be deposited by EPA in the WPSC Manitowoc MGP Special Account Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the WPSC Manitowoc MGP Special Account Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site.

c.    **Past Response Costs Payments**

(1)    The Financial Litigation Unit (FLU) of the United States Attorney's Office for the Eastern District of Wisconsin shall provide SD, in accordance with ¶ 84, with instructions regarding making payments to DOJ on behalf of EPA. The instructions must include a Consolidated Debt Collection System (CDCS) number to identify payments made under this CD.

(2)    For all payments subject to this ¶ 31.c, SD shall make such payment**:** by Fedwire Electronic Funds Transfer (EFT) / at https://www.pay.gov] to the U.S. DOJ account, in accordance with the instructions provided under ¶ 31.c(1), and including references to the CDCS Number, Site/Spill ID Number B5BW, and DJ Number 90-11-3-12152.

(3)    For each payment made under this ¶ 31.c, SD shall send notices, including references to the CDCS, Site/Spill ID, and DOJ numbers, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 84.

d.    **Future Response Costs Payments and Stipulated Penalties**

(1)    For all payments subject to this ¶ 31.d, SD shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DOJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
>   "D 68010727 Environmental Protection Agency"

(2)    For all payments made under this ¶ 31.d, SD must include references to the Site/Spill ID and DOJ numbers. At the time of any payment required to be made in accordance with ¶ 31.d, SD shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center,

all in accordance with ¶ 84. All notices must include references to the Site/Spill ID and DOJ numbers.

32.     **Contesting Future Response Costs**. SD may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs billed under ¶ 31 (Payments by SD for Future Response Costs) if it determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XX (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If SD submits a Notice of Dispute, SD shall within the 30-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to the United States, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. SD shall send to the United States as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SD shall pay the sums due (with accrued interest) to the United States within 7 days after the resolution of the dispute. If SD prevails concerning any aspect of the contested costs, SD shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States within 7 days after the resolution of the dispute. SD shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶¶ 31.d (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SD's obligation to reimburse the United States for its Future Response Costs.

33.     **Interest**. In the event that any payment for Past Response Costs or for Future Response Costs required under this Section is not made by the date required, SD shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue on the Effective Date. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SD's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of SD's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XIV (Stipulated Penalties).

## XI.     INDEMNIFICATION AND INSURANCE

34.     **SD's Indemnification of the United States**

a.    The United States does not assume any liability by entering into this CD or by virtue of any designation of SD as EPA's authorized representative under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SD shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SD's behalf or under its control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SD agrees to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SD in carrying out activities pursuant to this CD. Neither SD nor any such contractor shall be considered an agent of the United States.

b.    The United States shall give SD notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 34, and shall consult with SD prior to settling such claim.

35.    SD covenants not to sue and agrees not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States arising from or on account of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SD shall indemnify, save and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

36.    **Insurance**. No later than 15 days before commencing any on-site Work, SD shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion pursuant to ¶ 3.5 (Certification of RA Completion) of the SOW, commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SD pursuant to this CD. In addition, for the duration of this CD, SD shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SD in furtherance of this CD. Prior to commencement of the Work, SD shall provide to EPA certificates of such insurance and a copy of each insurance policy. Upon request by EPA, SD shall resubmit such

certificates and copies of policies each year on the anniversary of the Effective Date. If SD demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SD need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SD shall ensure that all submittals to EPA under this Paragraph identify the WPSC Manitowoc, MGP Site, Manitowoc, Wisconsin and the civil action number of this case.

## XII. FORCE MAJEURE

37.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SD, of any entity controlled by SD, or of SD's contractors that delays or prevents the performance of any obligation under this CD despite SD's best efforts to fulfill the obligation. The requirement that SD exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

38.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SD intends or may intend to assert a claim of force majeure, SD shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 5, within 24 hours of when SD first knew that the event might cause a delay. Within five days thereafter, SD shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SD's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SD, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SD shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. SD shall be deemed to know of any circumstance of which SD, any entity controlled by SD, or SD's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SD from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 37 and whether SD has exercised its best efforts under ¶ 37, EPA may, in its unreviewable discretion, excuse in writing SD's failure to submit timely or complete notices under this Paragraph.

39.     If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such

time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SD in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay is attributable to a force majeure, EPA will notify SD in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

40. If SD elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, it shall do so no later than 20 days after receipt of EPA's notice. In any such proceeding, SD shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SD complied with the requirements of ¶¶ 37 and 38. If SD carries this burden, the delay at issue shall be deemed not to be a violation by SD of the affected obligation of this CD identified to EPA and the Court.

41. The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SD from meeting one or more deadlines in the SOW, SD may seek relief under this Section.

## XIII. DISPUTE RESOLUTION

42. Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SD that have not been disputed in accordance with this Section.

43. A dispute shall be considered to have arisen when one party sends the other party a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

44. **Statements of Position**

a. In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within ten days after the conclusion of the informal negotiation period, SD invokes the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SD. The Statement of Position shall specify SD's position as to whether formal dispute resolution should proceed under ¶ 45 (Record Review) or 46.

b.　Within ten days after receipt of SD's Statement of Position, EPA will serve on SD its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 45 (Record Review) or 46. Within seven days after receipt of EPA's Statement of Position, SD may submit a Reply.

c.　If there is disagreement between EPA and SD as to whether dispute resolution should proceed under ¶ 45 (Record Review) or 46, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SD ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 45 and 46.

45.　**Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SD regarding the validity of the ROD's provisions.

a.　An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.　The Director of the Superfund Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 45.a. This decision shall be binding upon SD, subject only to the right to seek judicial review pursuant to ¶¶ 45.c and 45.d.

c.　Any administrative decision made by EPA pursuant to ¶ 45.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SD with the Court and served on all Parties within 14 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SD's motion.

d.　In proceedings on any dispute governed by this Paragraph, SD shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 45.a.

46.     Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.      The Director of the Superfund Division, EPA Region 5, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 44. The Superfund Division Director's decision shall be binding on SD unless, within 14 days after receipt of the decision, SD files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SD's motion.

b.      Notwithstanding ¶ L (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

47.     The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SD under this CD, except as provided in ¶ 32 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 55. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SD does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

## XIV.  STIPULATED PENALTIES

48.     SD shall be liable to the United States for stipulated penalties in the amounts set forth in ¶¶ 49.a and 50 for failure to comply with the obligations specified in ¶¶ 49.b and 50, unless excused under Section XII (Force Majeure). "Comply" as used in the previous sentence includes compliance by SD with all applicable requirements of this CD, within the deadlines established under this CD. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 5.6(a) (Initial Submissions) or 5.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of this Paragraph.

49.     **Stipulated Penalty Amounts - Payments, Financial Assurance, Major Deliverables, and Other Milestones**

a.   The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 49.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
| --- | --- |
| 1st through 14th day | $500 |
| 15th through 30th day | $1000 |
| 31st day and beyond | $5000 |

b.   **Obligations**

(1)   Payment of any amount due under Section X (Payments for Response Costs).

(2)   Establishment and maintenance of financial assurance in accordance with Section IX (Financial Assurance).

(3)   Establishment of an escrow account to hold any disputed Future Response Costs under ¶ 32 (Contesting Future Response Costs).

(4)   Failure to implement activities required by the Remedial Design Work Plan;

(5)   Failure to implement activities required by the Remedial Action Work Plan; and

(6)   Failure to meet any compliance date set forth in the RD or RA SOW.

50.   **Stipulated Penalty Amounts – Other Deliverables**. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD other than those specified in Paragraph 49.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
| --- | --- |
| 1st through 14th day | $300 |
| 15th through 30th day | $600 |
| 31st day and beyond | $2000 |

51.   In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 62 (Work Takeover), SD shall be liable for a stipulated penalty in the amount of $100,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 27 (Access to Financial Assurance) and 62 (Work Takeover).

52.   All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under Paragraph 5.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SD of any deficiency; (b) with respect

to a decision by the Director of the Superfund and Emergency Management Division, EPA Region 5, under ¶ 45.b or 46.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SD's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

53.     Following EPA's determination that SD has failed to comply with a requirement of this CD, EPA may give SD written notification of the same and describe the noncompliance. EPA may send SD a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SD of a violation.

54.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after SD's receipt from EPA of a demand for payment of the penalties, unless SD invokes the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 31.d (instructions for Future Response Cost Payments and Stipulated Penalties).

55.     Penalties shall continue to accrue as provided in ¶ 52 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 30 days after the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SD shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 55.c;

        c.      If the District Court's decision is appealed by any Party, SD shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SD to the extent that they prevail.

56.     If SD fails to pay stipulated penalties when due, SD shall pay Interest on the unpaid stipulated penalties as follows: (a) if SD has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 55 until

the date of payment; and (b) if SD fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 54 until the date of payment. If SD fails to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

57.     The payment of penalties and Interest, if any, shall not alter in any way SD's obligation to complete the performance of the Work required under this CD.

58.     Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SD's violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

59.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XV.    COVENANTS BY PLAINTIFF

60.     **Covenants for SD by United States**

Except as provided in  ¶ 61 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SD pursuant to Sections 106 and 107(a) of CERCLA and Section 7003 of RCRA, 42 U.S.C. § 6973, for the Work, Past Response Costs, and Future Response Costs. These covenants shall take effect upon the Effective Date.  These covenants are conditioned upon the satisfactory performance by SD of its obligations under this CD. These covenants extend only to SD and do not extend to any other person.

61.     **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SD with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SD with respect to:

        a.      liability for failure by SD to meet a requirement of this CD;

        b.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

        c.      liability based on the ownership of the Site by SD when such ownership commences after signature of this CD by SD;

        d.       liability based on the operation of the Site by SD when such operation commences after signature of this CD by SD and does not arise solely from SD's performance of the Work;

e.    liability based on SD's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SD;

f.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.    criminal liability;

h.    liability for violations of federal or state law that occur during or after implementation of the Work;

i.    liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

j.    liability for additional operable units at the Site or the final response action; and

k.    liability for costs that the United States will incur regarding the Site but that are not within the definition of Future Response Costs.

62.    **Work Takeover**

a.    In the event EPA determines that SD: (1) has ceased implementation of any portion of the Work; (2) is seriously or repeatedly deficient or late in its performance of the Work; or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SD. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SD a period of 14 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.    If, after expiration of the 14-day notice period specified in ¶ 62.a, SD has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SD in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 62.b. Funding of Work Takeover costs is addressed under ¶ 27 (Access to Financial Assurance).

c.    SD may invoke the procedures set forth in ¶ 45 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 62.b. However, notwithstanding SD's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 62.b until the earlier of (1) the date that SD remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the

date that a final decision is rendered in accordance with ¶ 45 (Record Review) requiring EPA to terminate such Work Takeover.

63. Notwithstanding any other provision of this CD, the United States retains all authority and reserve all rights to take any and all response actions authorized by law.

# XVI. COVENANTS BY SD

64. **Covenants by SD**. Subject to the reservations in ¶ 66, SD covenants not to sue and agrees not to assert any claims or causes of action against the United States with respect to the Work, Past Response Costs, Future Response Costs, and this CD, including, but not limited to:

      a.      any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

      b.      any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, Past Response Costs, Future Response Costs, and this CD; or

      c.      any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the State Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

65. Except as provided in ¶¶ 68 (Waiver of Claims by SD) and 75 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiff), other than in ¶¶ 61.a (claims for failure to meet a requirement of the CD), 61.g (criminal liability), and 61.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SD's claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

66. SD reserves, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SD's deliverables or activities.

67.     Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

68.     **Waiver of Claims by SD**

   a.     SD agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that it may have:

      (1)     **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to SD with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

      (2)     ***De Minimis*/Ability to Pay Waiver**. For response costs relating to the Site against any person that has entered or in the future enters into a final CERCLA § 122(g) *de minimis* settlement, or a final settlement based on limited ability to pay, with EPA with respect to the Site.

   b.     **Exceptions to Waivers**

      (1)     The waivers under this ¶ 69 shall not apply with respect to any defense, claim, or cause of action that SD may have against any person otherwise covered by such waivers if such person asserts a claim or cause of action relating to the Site against SD.

      (2)     The waiver under ¶ 68.a(1) (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

69.     SD agrees not to seek judicial review of the final rule listing the Site on the NPL based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

## XVII. EFFECT OF SETTLEMENT; CONTRIBUTION

70.     Except as provided in ¶ 68 (Waiver of Claims by SD), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SD), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

71.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD.  The "matters addressed" in this CD are the Work, Past Response Costs and Future Response Costs.

72.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

73.     SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

74.     SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States within 10 days after service of the complaint on SD. In addition, SD shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

75.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SD shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by

the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiff).

# XVIII.     ACCESS TO INFORMATION

76.    SD shall provide to EPA and the State, upon request and subject to ¶¶ 78 and 79, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SD's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SD shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

77.    **Privileged and Protected Claims**

a.    SD may assert that all or part of a Record requested by Plaintiff is privileged or protected as provided under federal law, in lieu of providing the Record, provided SD complies with ¶ 77.b, and except as provided in ¶ 77.c.

b.    If SD asserts a claim of privilege or protection, it shall provide Plaintiff with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SD shall provide the Record to Plaintiff in redacted form to mask the privileged or protected portion only. SD shall retain all Records that it claims to be privileged or protected until Plaintiff have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SD's favor.

c.    SD may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SD is required to create or generate pursuant to this CD.

78.    **Business Confidential Claims**. SD may assert that all or part of a Record provided to Plaintiff under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SD shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SD asserts business confidentiality claims. Records that SD claims to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified SD that the

Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SD.

79.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

80.     Notwithstanding any provision of this CD, Plaintiff retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

# XIX.   RETENTION OF RECORDS

81.     Until 10 years after EPA's Certification of Work Completion under ¶ 3.7 (Certification of Work Completion) of the SOW, SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SD who is potentially liable as owner or operator of the Site must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

82.     At the conclusion of this record retention period, SD shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the State, and except as provided in ¶ 77 (Privileged and Protected Claims), SD shall deliver any such Records to EPA or the State.

83.     SD certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

# XX.   NOTICES AND SUBMISSIONS

84.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s)

specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States**:
EES Case Management Unit
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
eescdcopy.enrd@usdoj.gov
Re: DJ # 90-11-3-12152

**As to EPA**:
Director, Superfund Division
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Mail Code: S-6J
Chicago, IL 60604

**and**:
Margaret Gielniewski
EPA Project Coordinator
United States Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Mail Code: SR-6J
Chicago, IL 60604-3507

**At to EPA Cincinnati Finance Center**:
EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

| | |
|---|---|
| **As to the State**: | Sarah Krueger |
| | State Project Coordinator |
| | Wisconsin Department of Natural Resources |
| | 2984 Shawano Avenue |
| | Green Bay, WI  54313 |
| | Sarah.Krueger@wisconsin.gov |
| | |
| | and: |
| | |
| | William J. Nelson |
| | Bureau of Legal Services |
| | Wisconsin Department of Natural Resources |
| | 101 South Webster Street |
| | Madison, WI  53703 |
| | William.Nelson@wisconsin.gov |
| | |
| **As to SD**: | Robert Paulson |
| | Settling Defendant's Project Coordinator |
| | WEC Energy Group Business Services |
| | 333 West Everett Street - A231 |
| | Milwaukee, WI 53203 |
| | robert.paulson@wecenergygroup.com |

## XXI.  RETENTION OF JURISDICTION

85.      This Court retains jurisdiction over both the subject matter of this CD and SD for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII. APPENDICES

86.      The following appendices are attached to and incorporated into this CD:

"Appendix A" is the AOC.

"Appendix B" is the ROD.

"Appendix C" is the description and/or map of the Site.

"Appendix D" is the SOW

# XXIII.     MODIFICATION

87.     Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and SD, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SD.  A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

88.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

# XXIV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

89.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SD consents to the entry of this CD without further notice.

90.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

# XXV. SIGNATORIES/SERVICE

91.     The undersigned representative of SD to this CD and the undersigned representative of the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

92.     SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SD in writing that it no longer supports entry of the CD.

93.     SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SD agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SD need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVI.        FINAL JUDGMENT

94.      This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

95.      Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States, and SD. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED this 7th day of April, 2021.

s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

Signature Page for CD regarding the WPSC Manitowoc MGP Superfund Alternative Site

**FOR THE UNITED STATES OF AMERICA:**

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Dated  February 18, 2021         __s/ Bonnie A. Cosgrove_____
                                 BONNIE A. COSGROVE
                                 Trial Attorney, Environmental Enforcement Section
                                 Environment and Natural Resources Division
                                 United States Department of Justice
                                 450 Golden Gate Ave, Suite 07-6714 (U.S. mail)
                                 San Francisco, CA  94102

                                 MATTHEW D. KRUEGER
                                 United States Attorney
                                 By: SUSAN KNEPEL
                                 Assistant United States Attorney
                                 Wisconsin State Bar No. 1016482
                                 517 E. Wisconsin Ave, Rm. 530
                                 Milwaukee, WI 53202

Signature Page for CD regarding the WPSC Manitowoc MGP Superfund Alternative Site

01/04/21
—————————
Dated

Digitally signed by
DOUGLAS BALLOTTI
Date: 2021.01.04
15:32:57 -06'00'

Douglas Ballotti, Director
Superfund & Emergency Management Division
Region 5
U.S. Environmental Protection Agency
Mail code S-6J
77 West Jackson Blvd
Chicago, Illinois 60604

43

Signature Page for CD regarding the WPSC Manitowoc MGP Superfund Alternative Site

**FOR** Wisconsin Public Service Corporation
[Print name of Settling Defendant]

02/11/2021
Dated

*Elizabeth Stueck-Mullane*

Name (print): Elizabeth Stueck-Mullane
Title:Vice President - Environmental
Address: 333 W. Everett St., Milwaukee WI 53203

Agent Authorized to Accept Service
Behalf of Above-signed Party:

| | |
|---|---|
| Name (print): | Wisconsin Public Service Corporation |
| Title: | N/A |
| Company: | c/o Corporate Creations Network Inc. |
| Address: | 4650 W. Spencer Street |
| | Appleton WI 54914 |
| Phone: | (920) 968-7701 |
| email: | contactus@corpcreations.com |

OB\61943282.1